[796 NYS2d 64]

In the Matter of METROPOLITAN MUSEUM HISTORIC DISTRICT CO-ALITION et al., Appellants, v PHILIPPE DE MONTEBELLO, as Director of the Metropolitan Museum of Art, et al., Respondents.

First Department, May 31, 2005

## APPEARANCES OF COUNSEL

*Weiss & Hiller, P.C.*, New York City (*Michael S. Hiller* of counsel), for appellants.

*Arnold & Porter LLP*, New York City (*Michael B. Gerrard* and *Richard Webster* of counsel), for Metropolitan Museum respondents.

*Michael A. Cardozo, Corporation Counsel,* New York City (*Ralph Janzen* and *Kristin M. Helmers* of counsel), for municipal respondents.

## OPINION OF THE COURT

NARDELLI, J.

In this appeal, we are called upon to review petitioners' challenge, pursuant to CPLR article 78, to a certain expansion and renovation project commenced by the museum respondents, with the approval of the municipal respondents, to the extent that petitioners seek to compel a review of the project under the State Environmental Quality Review Act (ECL 8-0101 *et seq.* [SEQRA]), and to direct the museum respondents to produce

certain documents pursuant to the New York State Freedom of Information Law (Public Officers Law § 84 *et seq.* [FOIL]).

Petitioner Metropolitan Museum Historic District Coalition (the Coalition) is an unincorporated association of local residents which, due to alleged traffic congestion, pollution and safety problems, opposes planned and, to a great extent, completed renovations to respondent the Metropolitan Museum of Art (the Museum). The individual petitioners are apparently founders and/or members of the Coalition. Respondents include: the Museum, its Director, President, and Chair of the Board of Trustees; the City of New York (the City); the City of New York Department of Parks and Recreation (the Parks Department); the City of New York Landmarks Preservation Commission (the Landmarks Commission); Mayor Michael R. Bloomberg; and various officials and agencies of the City.

The Museum, originally founded by private citizens in January 1870, was incorporated by the State Legislature later that same year (L 1870, ch 197, § 1). The Museum, as expounded by the Legislature, was incorporated "for the purpose of establishing and maintaining in [the] city a museum and library of art, of encouraging and developing the study of the fine arts, and the application of arts to manufacture and practical life"[1] (*id.*). In 1871, the State Legislature[2] authorized the City to erect a building for the Museum on City-owned land in Central Park (L 1871, ch 290, § 2), and thereafter directed the Parks Department[3] to lease the initial museum building, and future buildings to be erected on a specific, delineated portion of Central Park, to the Museum (L 1876, ch 139, § 2). The lease, executed and recorded on December 24, 1876, provided, as to its duration, that the demised building and property be transferred to, and held by, the Museum "as long as the [Museum] shall continue to carry out the objects and purposes defined in its charter, or

---

1. The Museum, despite the Legislature's broad statement of purpose, originally developed a "snobbish reputation" arising from the fact that most of the public could not gain admittance. The Museum's policy held firm, despite a petition by 10,000 individuals and appeals by almost every newspaper in the City, until the State Legislature threatened to block a proposed expansion in 1891 (Burrows and Wallace, Gotham, A History of New York City to 1898, at 1082 [1999]).

2. Apparently, as the result of some prodding from William Magear Tweed, also known as Boss Tweed (Burrows and Wallace, *supra* at 964).

3. The Parks Department was known in 1871 as the Department of Public Parks of the City of New York.

such other objects and purposes as by any future amendment of said charter may be authorized."[4]

The Museum thereafter experienced ongoing construction and renovation, and in 1967 its Trustees recognized the need to expand the facility to accommodate recent, major acquisitions. In view of this, the Museum retained a prominent architectural firm to prepare a master plan, which resulted in a proposed construction project entitled "the Centennial Master Plan" (the Master Plan). On January 20, 1971, the Parks Department, after conducting public hearings and soliciting public comment, approved the Master Plan which envisaged, inter alia, the addition of five new wings and extensive, internal rearrangement of the existing buildings.

The construction contemplated by the Master Plan continued over the course of the following two decades and was, for the most part, completed by the early 1990s. The final leg of the Master Plan, however, which involved the renovation of the Greek and Roman Galleries in Wing K, was never realized and, as a result, became part of a new plan the Museum was developing as part of its decision "to renew its vision for the twenty-first century." That plan, which was finalized for presentment to the City in October 2000, after several discussions with the Parks Department, is the genesis of this appeal (the 2000 Plan).

The 2000 Plan, in addition to the renovation of the Greek and Roman Galleries, called for, inter alia: increasing the capacity of the Uris Center for Education; creating a new, underground loading dock and registrar; reorganizing and improving food services, including a new central kitchen and additional public cafeterias; creating new auditoriums, galleries and library facilities within the existing museum footprint; and concealing existing rooftop mechanical equipment so as to improve the aesthetics of the view from Fifth Avenue. The 2000 Plan, in order to implement the above, provided for the addition of a second floor to the Rockefeller Wing and a total of 200,000 square feet of additional floor space.

The 2000 Plan was submitted for approval, on a Landmarks Commission application form, to then Parks Department Commissioner Henry Stern on November 13, 2000. Commissioner Stern thereafter signed off on the application on December 19,

---

4. In 1880, the Museum moved to its current location under its first director, Luigi di Cesnola, a naturalized citizen and former Civil War colonel who retained the title of director from 1879 through 1904 (New York Times, obituary of Luigi di Cesnola, Nov. 22, 1904, at 5).

2000 stating, in an affidavit submitted to the motion court, that his approval pivoted on two primary concerns which the 2000 Plan satisfied: that the renovations would not extrude beyond the Museum's existing footprint; and that the Museum would be able to meet its needs without detrimentally impacting Central Park, or the public's use and enjoyment of it. The application, with Commissioner Stern's signature, was then forwarded to the Landmarks Commission which, in reports dated March 27, 2001 and April 4, 2001, approved the various phases of the plan.

The murderous events of September 11, 2001, however, caused the Museum to reconsider its ambitious project, as revenue drastically decreased due to reduced tourism, cuts in government funding, and other economic factors. The Museum maintains that as a result of the sudden financial constraints, the scope of the 2000 Plan was curtailed so that: no more than 40,000 square feet of total floor space would be added to the Museum, rather than the originally planned 200,000 square feet; the scheduled demolition and replacement of the fountains on the Fifth Avenue plazas was abandoned; and certain projects, including the construction of additional space and a loading dock under the main plaza, were deferred.

The Museum began work within the parameters of the amended plan at some unspecified time and, by letter directed to the Museum and municipal defendants dated June 18, 2003, petitioners complained that the plans violated a long-standing commitment by the Museum not to expand onto additional land. The petitioners also opined that the construction would produce dire environmental consequences and demanded that the Museum cease and desist all work being performed under the 2000 Plan. The Museum, by letter dated July 17, 2003, rejected petitioners' demand and stated, inter alia:

> "The Museum does *not* have current plans to demolish, remove or replace its fountains, or to excavate under the plaza or behind the Museum. Such work has been considered but no decision has been made to proceed; if such a decision is made, any further needed approvals will be sought at that time. No thought is being given to reducing the number of parking spaces in the garage, to building above the existing roof line, or to expanding the perimeter of the Museum further into Central Park."

It is this letter that petitioners now argue triggered the four-month limitations period. The Museum, in response to petition-

ers' subsequent letter of August 12, 2003, also rejected petitioners' demand for certain documents pursuant to FOIL.

Petitioners thereafter commenced the within article 78 proceeding by the service of a notice of petition and verified petition on November 13, 2003. The petition interposed 10 causes of action asserting, inter alia, that the ongoing project violated: SEQRA; the City Environmental Quality Review procedures; the Uniform Land Use Review Procedure; the lease between the Museum and the Parks Department; and the New York City Charter. The tenth cause of action also sought an order directing the Museum to comply with petitioners' FOIL request. Shortly after petitioners commenced this proceeding on November 25, 2003, the Landmarks Commission issued its approval of the proposed amendments to the 2000 Plan.

The Museum, by the onset of 2004, had expended $41,000,000 on the planned renovations, having completed substantial portions of the work, including: a new public cafeteria; the temporary relocation of the Uris Education Center to an area which accommodated less than one half the school children; and the partial demolition of the old cafeteria in the Greek and Roman Galleries. The petitioners, in April 2004, obtained a temporary restraining order halting the project, which prompted the parties to enter into a stipulation, dated April 5, 2004, allowing the Museum to proceed with the renovations provided, inter alia, that the Museum: would not use blasting or dynamite in the work on Wing K; would not remove any trees; would not use any external cranes or jackhammers on the Museum; would not alter or remove any of the Museum's roofs or exterior walls; and would not store debris or construction equipment on the Fifth Avenue side of the building.

Supreme Court, in an order and judgment (one paper) entered May 20, 2004, held that the four-month statute of limitations period for petitioners' SEQRA claims began running on the date the Parks Department approved the Museum's proposed plan in December 2000, almost three years prior to the commencement of this proceeding, rendering it time-barred. Supreme Court also found that because the challenged construction had been substantially completed, claims pertaining to those improvements were moot; and that the Museum was not a government "agency" for the purpose of compelling document disclosure pursuant to FOIL. After thoroughly reviewing petitioners' remaining claims, Supreme Court dismissed the petition in its entirety.

Petitioners appeal, but limit their arguments to those claims brought under SEQRA and FOIL. Accordingly, we deem all of petitioners' other claims abandoned (*see Richbell Info. Servs., Inc. v Jupiter Partners, L.P.,* 309 AD2d 288, 308 [2003]; *Matter of East Harlem Bus. & Residence Alliance, Inc. v Empire State Dev. Corp.,* 273 AD2d 33, 34 [2000]), and upon a review of the surviving claims, we now affirm.

SEQRA was enacted in 1975 and became effective on September 1, 1976 (L 1975, ch 612, § 2, as amended by L 1976, ch 228, § 4). Its stated purpose is to declare a state policy which will encourage productive and enjoyable harmony between people and their environment; to promote efforts which will prevent or eliminate damage to the environment and enhance human and community resources; and to enrich the understanding of the ecological systems, natural, human and community resources important to the people of this state (ECL 8-0101). SEQRA, unlike its model and federal counterpart, the National Environmental Policy Act (42 USC § 4321 *et seq.* [NEPA]), does not merely require disclosure but " 'imposes far more "action-forcing" or "substantive" requirements on state and local decision makers than NEPA imposes on their federal counterparts' " (*Matter of Jackson v New York State Urban Dev. Corp.,* 67 NY2d 400, 415 [1986], quoting Gitlen, *The Substantive Impact of the SEQRA,* 46 Alb L Rev 1241, 1248).

An essential purpose of SEQRA is to incorporate environmental considerations directly into the governmental decision-making process as early as possible while it is still expedient to modify a proposed project in order to mitigate any adverse environmental effects (*Matter of Coca-Cola Bottling Co. of N.Y. v Board of Estimate of City of N.Y.,* 72 NY2d 674, 679-680 [1988]; *Matter of Roosevelt Islanders for Responsible Southtown Dev. v Roosevelt Is. Operating Corp.,* 291 AD2d 40, 51 [2001], *lv denied* 97 NY2d 613 [2002]). The "heart" of SEQRA (*Matter of Jackson v New York State Urban Dev. Corp., supra* at 415), and the primary mechanism by which it verifies the environmental integrity of any projects which "may have a significant effect on the environment" is the required preparation of an environmental impact statement (EIS) (ECL 8-0109; *Matter of Roosevelt Islanders,* 291 AD2d at 51).

It is well established that an article 78 proceeding challenging a municipality's compliance with SEQRA must be commenced within four months of the final determination of the agency (CPLR 217 [1]; *Matter of Young v Board of Trustees of*

*Vil. of Blasdell*, 89 NY2d 846, 848 [1996]; *Matter of Concerned Port Residents Comm. v Incorporated Vil. of Sands Point*, 291 AD2d 494, 495 [2002]). An agency's determination is final, thereby triggering the statutory limitations period, when the agency arrives at a " ' "definitive position on the issue that inflicts an actual, concrete injury" ' " (*Matter of Essex County v Zagata*, 91 NY2d 447, 453 [1998], quoting *Church of St. Paul & St. Andrew v Barwick*, 67 NY2d 510, 519 [1986], *cert denied* 479 US 985 [1986], quoting *Williamson County Regional Planning Comm'n v Hamilton Bank of Johnson City*, 473 US 172, 193 [1985]). Stated another way, "the Statute of Limitations begins to run when the agency adopts plans committing itself to a course of action which may affect the environment" (*Matter of Lighthouse Hill Civic Assn. v City of New York*, 275 AD2d 322, 324 [2000], *lv denied* 95 NY2d 768 [2000]; *see also Matter of Young*, 89 NY2d at 848). A determination is not final until the aggrieved party receives notice of the determination (*New York State Assn. of Counties v Axelrod*, 78 NY2d 158, 165 [1991]; *90-92 Wadsworth Ave. Tenants Assn. v City of N.Y. Dept. of Hous. Preserv. & Dev.*, 227 AD2d 331 [1996]).

In this matter, we agree with Supreme Court that then-Commissioner Stern's execution and referral of the Museum's application to the Landmarks Commission in December 2000 embodies the Parks Department's final determination that no SEQRA action was required, as the Parks Department was the agency that oversaw any potential environmental consider-ations. We find without merit petitioners' arguments: that the Parks Department approval of the 2000 Plan was nonfinal because a future Landmarks Commission nonapproval would have, in effect, rendered the 2000 Plan "unworkable"; and that the necessity for the Landmarks Commission's approval made the date of "final determination" ambiguous.

In the first instance, the Landmarks Commission issued its approval of the various stages of the 2000 Plan in March and April 2001, and there is no dispute that petitioners were aware of those approvals. So, at the very least, even allowing that petitioners did not receive notice of the Parks Department's de-termination until April 2001, rendering it final at that time, this proceeding was still time-barred no later than August 2001, 27 months before it was commenced.

Moreover, the necessity of a Landmarks Commission review does not create any ambiguity as to the date of the final agency determination for the purposes of SEQRA. In *Matter of Citi-*

*neighbors Coalition of Historic Carnegie Hill v New York City Landmarks Preserv. Commn.* (306 AD2d 113 [2003], *appeal dismissed* 2 NY3d 727 [2004]), this Court held that determinations by the Landmarks Commission are not subject to SEQRA because they are narrowly circumscribed by architectural, aesthetic, historical and other factors specifically set forth in the Landmarks Preservation Law and that "[w]here, as here, 'an agency has some discretion, but that discretion is circumscribed by a narrow set of criteria which do not bear any relationship to the environmental concerns that may be raised in an EIS, its decisions will not be considered "actions" for purposes of SEQRA's EIS requirements' " (*id.* at 114, quoting *Incorporated Vil. of Atl. Beach v Gavalas*, 81 NY2d 322, 326 [1993]; *see also Stop-The-Barge v Cahill*, 1 NY3d 218, 223-224 [2003]; *Matter of Lighthouse Hill Civic Assn.*, 275 AD2d at 324). Accordingly, the Parks Department's December 2000 decision approving the 2000 Plan was the final agency determination concerning SEQRA review.

We reject petitioners' attempt to circumvent the four-month statutory period by characterizing this proceeding as one in the nature of mandamus, as the statute of limitations begins to run from the time of the agency's determination, and not from petitioners' demand that the Parks Department conduct a SEQRA review of the project (*Matter of Sierra Club, Inc. v Power Auth. of State of N.Y.*, 203 AD2d 15, 16 [1994]; *Matter of Bonar v Shaffer*, 140 AD2d 153, 156 [1988], *lv denied* 73 NY2d 702 [1988]).

Finally, petitioners correctly point out that the Parks Department violated the procedures enumerated in Administrative Code of the City of NY § 25-318 (a) by approving the 2000 Plan prior to referring the matter to the Landmarks Commission. The Commissioner, however, did not act outside his statutory authority when he executed the application and approved the 2000 Plan (*see* New York City Charter § 533 [a] [6]), which would have rendered such approval void and subject to collateral attack, but instead committed a procedural error which could have been challenged, within four months of the act, by an article 78 proceeding (*see Matter of Town of Ohio v New York State Off. of Real Prop. Servs.*, 241 AD2d 878, 879 [1997], *lv denied* 91 NY2d 801 [1997]; *see also Matter of Foy v Schechter*, 1 NY2d 604 [1956]; *Crell v O'Rourke*, 88 AD2d 83, 86 [1982], *affd* 57 NY2d 702 [1982]). It was not.

In view of the foregoing, petitioners' claims challenging the municipal respondents' SEQRA determination were properly dismissed as untimely.

■ Petitioners' remaining claim, which seeks the production of certain documents from the Museum pursuant to FOIL, must also be dismissed. "The Legislature enacted FOIL to provide the public with a means of access to governmental records in order to encourage public awareness and understanding of and participation in government and to discourage official secrecy" (*Matter of Newsday, Inc. v Sise*, 71 NY2d 146, 150 [1987], *cert denied* 486 US 1056 [1988]; *see also Matter of Alderson v New York State Col. of Agr. & Life Sciences at Cornell Univ.*, 4 NY3d 225, 230 [2005]). Public Officers Law § 87 (2) provides, in relevant part, that "[e]ach agency shall, in accordance with its published rules, make available for public inspection and copying all records, except that such agency may deny access to records or portions thereof" that fall within one of the delineated exemptions. An "agency" is defined as:

> "[A]ny state or municipal department, board, bureau, division, commission, committee, public authority, public corporation, council, office or other governmental entity performing a governmental or proprietary function for the state or any one or more municipalities thereof, except the judiciary or the state legislature." (Public Officers Law § 86 [3].) The term "agency" under FOIL must be given "its natural and most obvious meaning and must be liberally construed to further the general purpose of FOIL" (*Matter of Buffalo News v Buffalo Enter. Dev. Corp.*, 84 NY2d 488, 492 [1994] [internal quotation marks omitted]).

The record herein reveals that the Museum is a not-for-profit educational corporation controlled by a Board of Trustees consisting of 40 self-elected individuals. The City retains no authority to hire or fire the Museum's Director or President, and no city representatives sit on the Executive Committee of the Board, although five of seven ex-officio Trustees are city officials. Moreover, the Museum's operating and capital budgets are primarily privately funded, and its budgets are not subject to city approval or public hearings.

Since, as Supreme Court correctly held, the Museum is not controlled by municipal officials, there is no danger that they can act through the Museum in order to shield their actions

from public scrutiny, and FOIL's overriding purpose of promoting "open and accessible government . . . a hallmark of a free society" (*Matter of Russo v Nassau County Community Coll.*, 81 NY2d 690, 697 [1993]), is not implicated.

Accordingly, the order and judgment (one paper, denominated a decision and order) of the Supreme Court, New York County (Marcy S. Friedman, J.), entered May 20, 2004, which, to the extent appealed from as limited by the briefs, dismissed petitioners' SEQRA and FOIL claims, should be affirmed, without costs.

MAZZARELLI, J.P., SAXE, MARLOW and ELLERIN, JJ., concur.

Order and judgment (one paper, denominated a decision and order), Supreme Court, New York County, entered May 20, 2004, affirmed, without costs.