OPINION OF THE COURT
James B. Canfield, J.
Petitioners commenced this CPLR article 78 proceeding challenging respondents’, City of Troy, the City of Troy Planning Board, Peter Kehoe, in his official capacity as Chairman of the City of Troy Planning Board, and Terry Dubois, in his capacity as Director of the Bureau of Code Enforcement (Troy), decisions granting respondents George Weston Bakeries Inc. and Freihofer Sales Company’s application to raze two allegedly historic buildings on property that Freihofer owns in the Lansingburgh section of Troy. Instead of filing answers and raising their objections of law therein, Troy and Freihofer moved and cross-moved to vacate the temporary restraining order and to dismiss the petition. Troy and Freihofer’s motions to dismiss improperly incorporated arguments involving the underlying merits of this proceeding and allegations regarding events during the administrative process. In order for the court to consider all of Troy and Freihofer’s arguments it was therefore necessary to give Troy and Freihofer additional time to file answers, the record and supporting affidavits and then permit petitioners to respond. Stephen Comer also moved to intervene.
Ironically, this proceeding’s significance lies not in the historic significance of Freihofer’s buildings or the environmental impact of the development that would follow their demolition, but in the lengths to which respondents have stretched their legal arguments for the purpose of avoiding the State Environmental Quality Review Act (SEQRA) and judicial review. Troy and Freihofer appear to be unwilling to engage in the SEQRA *583 process because they are convinced that Freihofer’s buildings should be razed. Having made up their minds without going through the SEQRA process, they are convinced that it would serve no practical purpose to go through the SEQRA process in this or other instances of building demolition.
The court rejects respondents’ practical reasons for placing the buildings’ demolition beyond SEQRA’s reach as irrelevant to proper SEQRA analysis. Respondents’ conviction that demolition of Freihofer’s buildings is inevitable and SEQRA would therefore serve no practical purpose is irrelevant because SE-QRA is a “process” act rather than a “substantive” act. SE-QRA’s purpose is not to save every old building, but to force decision makers to engage in a logical process for making complex decisions. Decision makers must assemble all of the relevant long- and short-term factors before rendering a decision that is likely to have an impact on the environment. Whether or not the decision maker arrives at the wisest decision is a matter that the Legislature has left to the decision makers. Nevertheless, the SEQRA process is valuable and society is better served by SEQRA than it would be by ignoring it, even in situations where the SEQRA process ultimately ratifies the respondents’ decision to demolish old structures with historic value and replace them with commercial venues with little aesthetic appeal.
Respondents’ practical considerations are not only irrelevant to the question of whether SEQRA review is necessary, they are also unfounded. For example, petitioners are not responsible for the five years that elapsed since Freihofer stopped using its buildings and began the process of marketing the property. The court recognizes and commends Freihofer’s cooperation with efforts to find alternate uses for the property, but there is no escaping the conclusion that this matter would almost certainly have been resolved some years ago had Freihofer and the would-be purchaser of its property proceeded with the SEQRA process as was required in the prior proceeding.
Turning to the legal issues raised by respondents, the court notes that “on a motion to dismiss a petition upon an objection in point of law, all of the allegations contained in the petition are deemed to be true . . . and the facts contained in the petition must be considered in their most favorable light” (Matter ofManupella v Troy City Zoning Bd. of Appeals, 272 AD2d 761, 762 [2000]; Matter of Parisella v Town of Fishkill, 209 AD2d 850, 851 [1994]). Respondents have largely ignored this *584 touchstone. Troy, for example, fails to acknowledge, much less address, the significant fact that most of these petitioners have already been found to have “standing” in Matter of Ziemba v City of Troy (295 AD2d 693 [2002] [RJI No. 41-0238-2000]). Freihofer’s purchaser pursued the matter into 2002 but then lost interest when Troy required it to file an environmental impact statement (EIS).
Freihofer acknowledges the prior proceedings, but fails to show that the prior determination in petitioners’ favor is not binding in this proceeding. Freihofer’s attempt to distinguish its present application from the earlier application depends on its mischaracterizing the earlier case and attempting to create a distinction without any real difference. The earlier case also involved a proposed commercial development that was to be created after the buildings were demolished. The court’s failure to specifically analyze the question of whether the petitioners would have standing in the event that the application was solely for the purpose of demolishing the buildings was not a determination that the petitioners did not have standing to challenge demolition, or that the petitioners’ standing was not also properly based upon their opposition to that necessary precursor to plans for commercial development.
In point of fact, there is no real difference between Freihofer now asking to tear down the buildings and the earlier plans to tear down the buildings and erect new commercial buildings. Even accepting Freihofer’s counsel’s assurance that his client has no “immediate” plan to do anything other than sell the property after it demolishes the buildings, it is inescapable that demolition of the buildings is more than simply the first step toward commercial development of the property. Freihofer’s insistence on demolishing the buildings results from its recognition that once the buildings are razed, it or any other developer will have very little difficulty in obtaining approval to develop the property as they earlier proposed. The existing buildings’ age and claim to historic importance are the most critical factors favoring preserving the property. The fate of the property clearly hinges on whether the buildings are demolished and Freihofer’s assertion that the matters are not connected is disingenuous.
Troy also attempts to raise, argue and have the court resolve the merits of the petitioners’ cause of action in the guise of arguing that petitioners lack “standing.” Not only has Troy gone outside of the proper bounds of a motion to dismiss, but Troy also attempts to shift its initial burden on a summary *585 judgment motion to petitioners. Troy compounds those errors with its illogical argument that in light of Troy’s complete failure to engage in the SEQRA process and its resulting ignorance, there are no facts to support petitioners’ claims and the court should accept Troy’s counsel’s uninformed assurance that there is no historical importance to the affected buildings and that the site does not contain any Native American relics. Troy cannot have it both ways. It cannot both refuse to engage in the environmental review and also claim that its naive conclusion that there will be no environmental harm is entitled to the same deference as decisions reached after performing a SEQRA analysis. In any event, Troy has provided no basis for stripping the petitioners of the earlier determination that they have standing.
Even assuming for the sake of the argument that petitioners’ standing had not already been established, the petitioners would have standing in this proceeding. A litigant has standing to maintain an action upon alleging an injury in fact that falls within his or her zone of interest. “The existence of an injury in fact — an actual legal stake in the matter being adjudicated— ensures that the party seeking review has some concrete interest in prosecuting the action which casts the dispute ‘in a form traditionally capable of judicial resolution’ ” (Silver v Pataki, 96 NY2d 532, 539 [2001]; Society of Plastics Indus. v County of Suffolk, 77 NY2d 761, 772 [1991]). The ultimate purpose of standing is to ensure that petitioners are the proper persons to challenge an administrative action, not to eliminate the possibility of there being anyone who can bring an administrative challenge.
Despite the passage of 14 years, Society of Plastics Indus. v County of Suffolk (77 NY2d 761 [1991]) remains the standard by which “standing” is determined. The parties cite cases that are inconsistent with each other and sometimes inconsistent with Society of Plastics. None of the cases purports to alter or advance the Society of Plastics’ standing rule. There having been no change in the Society of Plastics’ rule, the court finds that the proper means for eliminating the conflict in the later cases is to rely on the “original” standing rule, rather than pick and choose among the various inconsistent translations that have been rendered over the intervening years.
The essence of the Society of Plastics’ “standing” rule is contained in the majority’s explanation of “standing’s” role in eliminating inappropriate litigation and the majority’s response *586 to the dissent’s biting criticism that the majority had eliminated legitimate litigation by “establishing] criteria so restrictive as to present a virtual bar to SEQRA challenges to legislative actions having such area-wide environmental effects” (Society of Plastics Indus. v County of Suffolk, supra at 781). It will be remembered that Society of Plastics began as a piece of purported environmental litigation brought by an anti-environmental trade group to obstruct an environmental law. Had the Court of Appeals found that those plaintiffs had standing, it would have opened the flood gates to similar spurious litigation commenced by other well-financed opponents of environmental protection for the purpose of protecting their own economic interest in the status quo by stalling and nullifying governmental activity during the years necessary to fully litigate their myriad contrived issues. Such litigation would have transformed SEQRA into an instrument for blocking rather than promoting environmental protection. “Standing” provided an effective tool to winnow the wheat from the chaff at the beginning of the litigation process and thereby prevent improper use of “citizens’ suits” as a delaying tactic by those whose interests are inconsistent with the environmental purposes of SEQRA and/or who are motivated by economic interests that are contrary to environmental concerns (Society of Plastics Indus. v County of Suffolk, supra at 773, 774, 779; Matter of Sun-Brite Car Wash v Board of Zoning & Appeals of Town of N. Hempstead, 69 NY2d 406, 415 [1987]).
The Society of Plastics’ dissent’s assertion that the majority had virtually eliminated the possibility of legal challenge, if true, raised the very damning specter that the new standing rule placed all governmental action beyond challenge. The majority rejected and disproved the dissent’s accusation by setting forth the process that should be followed and describing the broad group of potential litigants who would have standing to challenge the County’s rule based on the plaintiffs’ contrived allegations of environmental harm. The first step the majority took was to extend the scope of “localized rules” beyond the narrow limits of zoning matters (Society of Plastics, supra at 780-781). Once the majority broadened the types of localized actions covered, the majority then described the broad group of potential litigants who would have standing to challenge those localized actions.
The Society of Plastics’ process begins with determining whether the action challenged in this case falls within the *587 broader definition of a localized action by looking to see whether it is “geographically centered in its aim and effect, or indiscriminate” (Society of Plastics, supra at 780). Allowing demolition of Freihofer’s buildings is clearly “geographically centered” rather than “undifferentiated [and] area-wide.” (Id. at 781.) Thus, the action is localized action.
The next step in determining whether this is appropriate litigation is to determine whether petitioners have the necessary “special interest.” In Society of Plastics, the majority found that there was
“a large pool of potential plaintiffs whose interests satisfy the policy goals of SEQRA and of the standing doctrine, with no compromise of the courts’ commitment to the enforcement of SEQRA. This is not a case where to deny standing to this plaintiff would be to insulate governmental action from scrutiny” (Society of Plastics Indus. v County of Suffolk, supra at 779).
The majority’s description of the large pool of residents of the county that would have the requisite “special interest” is the factor most often ignored by courts which have narrowed standing beyond the Society of Plastics’ standard.[1] The “large pool” of potential plaintiffs who would have the required “special interest” were “those near [the] traffic” generated by the “alleged harmful effects of increases in trucking traffic to and from the landfills” and “residents close to those facilities [landfills and plants manufacturing paper substitutes that allegedly threaten environmental harm] that would directly suffer the alleged harms” (Society of Plastics Indus. v County of Suffolk, supra at 779).
The majority held that anyone who was “near” the alleged traffic or “close” to the facilities where the garbage was being landfilled or the paper substitutes were being manufactured would have the necessary special interest for standing. Petitioners’ interests in this case are clearly consistent with the environmental purposes of SEQRA and they are clearly not motivated by economic interests that are contrary to environ *588 mental concerns. The petitioners have standing to commence this litigation because they live close to Freihofer’s property, would suffer the significant and detrimental impact on the surrounding neighborhood that would result from demolishing the buildings, and are legitimately interested in protecting the remaining residential quality of the area where Freihofer’s buildings are. That meets their burden of showing that they have the necessary special interest to have standing.
By characterizing the petitioners as having no more interest than members of the “general public,” Troy and Freihofer are engaging in foolish word play. While the individual petitioners are members of the “general public,” Troy and Freihofer’s conclusion that the harm that the petitioners would suffer is no different than the “general public’s” is incorrect and inconsistent with Society of Plastics' holding. The “general public” in this case also includes citizens of Troy located miles away in south Troy and residents of neighboring communities whose harm from Freihofer’s plans is far more attenuated than the petitioners’ harm. Some of the petitioners here can see the Freihofer’s property. The petitioners in this case include individuals who are close to the Freihofer’s site and thus will suffer the alleged harm resulting from demolition of the existing buildings to a greater degree than the “general public.”
Respondents are also mistaken in arguing that petitioners need to be immediately adjacent to Freihofer’s property or directly view it, or live some very short distance away from the property in order to have standing. As pointed out above, the Court of Appeals did not limit standing to only those Suffolk County residents who were immediately adjacent to the landfill or the factories that would be creating paper products. It did not require that the plaintiffs be the closest residents in order to have standing.
To the extent that Troy and Freihofer argue that the fact that none of the petitioners live on one of the abutting properties is relevant to standing, their argument is rejected. The fact that more people have suffered or will suffer an injury sufficient to support standing than the number of people who actually commence an action, cannot logically serve as a basis for denying standing. Such a rule would serve to deny standing in all cases and thereby insulate the respondents’ conduct from judicial review in every case (Silver v Pataki, 96 NY2d 532, 541 [2001]). When Society of Plastics promised that there will be a “large pool of potential plaintiffs,” it did not require all of the *589 “potential plaintiffs” in the pool to join in commencing the action.
The court next rejects respondents’ argument that petitioners must demonstrate “actual harm” in order to have standing. Any assessment of the extent of actual harm must logically wait until the court reaches the merits of the proceeding. Even if the respondents had engaged in SEQRA analysis and were in a position to discuss whether there will be any harm, analysis of actual harm is completely premature in a motion to dismiss based upon standing. It is no mere happenstance that when describing the large pool of potential litigants who would have standing, the Society of Plastics majority carefully avoided evaluating the validity of plaintiffs’ contrived claims of environmental harm and instead accepted those claims at face value (Society of Plastics, supra at 778-779, 780). Thus, while the courts may look at whether petitioners’ interests are consistent with the environmental purposes of SEQRA or whether they are motivated by economic interests that are contrary to environmental concerns, “standing” does not depend on determining whether there will be any actual environmental harm.
Finally, the court rejects the respondents’ suggestion that the Historic Action Network lacks standing or has no interest in protecting the buildings from demolition because it has been unsuccessful in obtaining a purchaser who will restore the buildings or placing the buildings on the historic register. Those “factors” are not even relevant to determinating standing.
Having rejected the respondents’ motions to dismiss, the court turns to the merits of the proceeding. Troy and Freihofer defend their failure to engage in the SEQRA process by claiming that Troy’s issuing a demolition permit to Freihofer is merely a “ministerial” action and is thus excluded from SEQRA pursuant to Environmental Conservation Law § 8-0105 (5) (ii).[2] This is a case of first impression to the extent that respondents suggest that the question of whether a particular decision is “discretionary” or “ministerial” depends solely on how the act *590 ing agency characterizes it or whether the agency includes environmental factors in its list of matters to be considered. Respondents’ “ministerial exception” argument would give agencies full authority to decide whether to comply with SEQRA because they would have complete authority to create “ministerial” exceptions to SEQRA simply by declaring that the particular action in question is “ministerial,” or eliminating environmental factors from the determination. The “ministerial exception” that the respondents envision would permit Troy and other municipalities to nullify SEQRA at will. Those courts which have previously considered whether or not particular activities fit within the ministerial exception have never expressly or implicitly ceded final authority to municipalities and agencies to decide for themselves whether to comply with SEQRA. The court declines to cede such authority now.
Respondents’ argument for extending Troy’s authority in these matters takes advantage of flaws in the analysis in Incorporated Vil. of Atl. Beach v Gavalas (81 NY2d 322 [1993]) and demonstrates the need for a rule that will work in all cases. The primary flaw in Incorporated Vil. of Atl. Beach is its failure to acknowledge and address the fundamental difference between “discretionary” and “ministerial” determinations. When the Court of Appeals blurred the boundary between “discretionary” and “ministerial” by encouraging courts not to rely on “a mechanical distinction between ministerial and discretionary acts alone” (Incorporated Vil. of Atl. Beach v Gavalas, 81 NY2d 322, 326 [1993]), it neglected or avoided the normal statutory interpretation process (Majewski v Broadalbin-Perth Cent. School Dist., 91 NY2d 577 [1998]) and, thus, failed to set forth the legislative purpose that guided their modifying “ministerial” to include “discretionary.” Had the Court of Appeals set forth the legislative intent, it would be clear that the “ministerial exception” was not intended to give agencies authority to opt out of SEQRA.
The Court of Appeals test for distinguishing between discretionary decisions that are “discretionary” and those that are “ministerial” ostensibly involves determining whether the factors that are included in an EIS are used for rendering the decision in question (Incorporated Vil. of Atl. Beach v Gavalas, 81 NY2d 322, 326-327 [1993]). In theory, that standard should work without interfering with or undermining SEQRA, but, in practice, it has proved to be unworkable. For example, the Court of Appeals could not follow its own rule in Incorporated Vil. of *591 Atl. Beach because Local Law No. 2 (1977) of the Incorporated Village of Atlantic Beach actually required applicants for permits to state what effect the proposed action would have on the environment and provided that determinations on those applications would assess the environmental impact. Had the Court of Appeals followed the rule as stated, it would have been compelled to approve Atlantic Beach’s requiring a second SE-QRA review.
The decisions after Incorporated Vil. of Atl. Beach have also been unable to follow the rule as written. In order to exempt discretionary determinations from SEQRA in those cases, the courts either ignore the fact that the agency is actually considering factors that are contained in an EIS, or attempt to justify the exemption on the grounds that the agency is not considering all of the factors contained in an EIS. For example, one court rejected SEQRA review because the agency actions
“are narrowly circumscribed by architectural, aesthetic, historical and other factors specifically set forth in the Landmarks Preservation Law and that ‘[w]here, as here, “an agency has some discretion, but that discretion is circumscribed by a narrow set of criteria which do not bear any relationship to the environmental concerns that may be raised in an EIS, its decisions will not be considered ‘actions’ for purposes of SEQRA’s EIS requirements” ’ ” (Matter of Metropolitan Museum Historic Dist. Coalition v De Montebello, 20 AD3d 28, 36 [2005]).
Another court was presented with a question involving development of a section of Staten Island classified as a Special Natural Area District which required special analysis of the environmental effect of actions, “such as the modification of topography, relocation of erratic boulders, or alteration of the botanic environment” (Matter of Lighthouse Hill Civic Assn. v City of New York, 275 AD2d 322, 323 [2000]). Had these courts followed the Court of Appeals rule, they would have been required to find that a SEQRA review was needed. They instead followed the Court of Appeals approach and ignored that “architectural, aesthetic, historical” factors or changing the topography of protected nature areas are properly part of an EIS. SEQRA’s definition of “environment” expressly includes “the physical conditions which will be affected by a proposed action, including land, air, water, minerals, flora, fauna, noise, objects of historic or aesthetic significance, existing patterns of population concentration, distribution, or growth, and existing community *592 or neighborhood character” (ECL 8-0105 [6]). Those courts’ efforts to justify their actions are inconsistent with SEQRA and invite unwarranted wholesale exemption of “discretionary” determinations.
The real problem with the courts’ analysis is not that it is inconsistent with SEQRA and requires the courts to ignore the facts in the cases, the problem is that the courts neglected to explain their underlying assumptions. Foremost among those unstated, but necessary, assumptions underlying Incorporated Vil. of Ail. Beach and its progeny is that all of the “discretionary” determinations that courts turned into “ministerial” decisions for the purpose of the exemption shared the unusual characteristic of either following or including a rigorous analysis of the pertinent environmental factors. Thus, there was no apparent need for or harm in eliminating another environmental review in those cases. Avoiding redundancy better explains the difference between the “discretionary” building permit in Matter of Pius v Bletsch (70 NY2d 920 [1987]) and the “ministerial” building permit in Incorporated Vil. of Atl. Beach. Had the Court of Appeals relied on the superfluity of further SEQRA review, it would not have needed to ignore the fact that Atlantic Beach’s decision making process actually required looking at environmental factors. Similarly, the later cases would not have had to ignore the facts in order to eliminate redundant SEQRA review (Metropolitan Museum Historic Dist. Coalition v De Montebello, 20 AD3d 28 [2005]; Matter of Citineighbors Coalition of Historic Carnegie Hill v New York City Landmarks Presero. Commn., 306 AD2d 113 [2003]; Matter of Lighthouse Hill Civic Assn. v City of New York, 275 AD2d 322 [2000]).
While there was no practical harm in those cases when the courts cited the Incorporated Vil. of Atl. Beach rule and then ignored it and the relevant facts, there was no harm because there had already been SEQRA or quasi-SEQRA review. The same cannot be said about cases like this where there will be environmental impact and there has been no environmental review. It certainly makes no logical sense to exempt discretionary decisions that will impact the environment from SEQRA review where the absence of environmental consideration results from the agency choosing not to consider environmental factors or to eliminate such factors from its list of matters to be considered. Allowing governmental agencies to eliminate potential SEQRA review of their administrative process simply by eliminating relevant EIS factors from the administrative *593 process turns SEQRA’s modest “ministerial” exception into a gaping breach. An agency’s characterization of its own activity is merely some evidence; it is not dispositive. The courts retain an obligation to look at the reality of the particular administrative action in question and may not simply accept the agencies’ characterization of its activity at face value.
The court also rejects Troy’s argument that an application for a demolition permit does not require an EIS because it actually is “ministerial.” The process is not “ministerial” in the literal sense. Code of the City of Troy § 141-29 includes a discretionary element to demolition approval that is directed at protecting not only the adjoining neighbors, but the surrounding neighborhoods as a whole (Code of City of Troy § 141-29 [D]). Code of the City of Troy § 141-29 (F) establishes that there is discretion and that the neighborhood has a two-week period to make its views known regarding the effect that demolition will have prior to the issuance of a demolition permit. Discretion is not simply to be gleaned from reading the City Code, but Troy demonstrated that demolition is not ministerial by engaging in a hasty discretionary process to evaluate whether buildings should be demolished.
The court finds that issuance of the discretionary demolition permit here is also not “ministerial” even using the test as set forth in Incorporated Vil. of Atl. Beach. There has been no SE-QRA or quasi-SEQRA analysis as part of the discretionary determination here and SEQRA analysis would not be superfluous in the fashion of Metropolitan Museum Historic Dist. Coalition v De Montebello (20 AD3d 28 [2005]); Matter of Citineighbors Coalition of Historic Carnegie Hill v New York City Landmarks Preserv. Commn. (306 AD2d 113 [2003]); Matter of Lighthouse Hill Civic Assn. v City of New York (275 AD2d 322 [2000]). Although Troy has a discretionary process set forth in its Code, the court observes that Troy attempted to short-circuit such administrative review as is presently required by the Troy City Code for the purpose of speeding demolition of Freihofer’s buildings. Troy has presented no evidence that would support a finding that it has made any real effort during the course of considering the demolition permit to consider “the physical conditions which will be affected by [demolition of Freihofer’s buildings], including land, air, water, minerals, flora, fauna, noise, objects of historic or aesthetic significance, existing patterns of population concentration, distribution, or growth, and existing community or neighborhood character” *594 (ECL 8-0105 [6]). Thus, it cannot be said that further SEQRA analysis would serve no purpose or be redundant to the analysis which was performed during the administrative process.
Finally, the court addresses the Comer motion to intervene. Comer alleges that he is an enrolled member of the Stockbridge-Munsee Band of Mohican Indians, a federally recognized Native American tribe, which once lived in the area that included Freihofer’s buildings. Comer is the only member of the tribe presently living within the bounds of the tribe’s aboriginal territory and expresses particular interest in the site of the Freihofer’s buildings based on evidence of Native American burials there. A court “may allow other interested persons” to intervene in a special proceeding pursuant to CPLR 7802 (d). This provision grants the court broader and more liberal authority to allow intervention in an article 78 proceeding than is provided in an action pursuant to CPLR 1013, which requires that the proposed intervenor’s “claim or defense and the main action have a common question of law or fact” (Matter of Greater N.Y. Health Care Facilities Assn. v DeBuono, 91 NY2d 716, 720 [1998]). The court finds that it is proper to grant Comer’s motion to intervene.
Accordingly, respondents’ motions to dismiss are denied with $100 costs each, the Comer motion to intervene is granted without costs, and the petition is granted with $100 costs against Troy and Freihofer to the extent of declaring that the demolition of Freihofer’s buildings is subject to SEQRA, vacating Troy’s demolition permit allowing Freihofer to demolish the buildings, enjoining demolition of Freihofer’s buildings until after environmental assessment forms and EISs are prepared and the necessary SEQRA review is conducted and granting petitioners access to the property for the purpose of stabilizing the roof and protecting the structures from the weather during the pendency of the administrative process. Freihofer’s application for a bond to cover its costs is denied based on the court’s determination that an injunction is warranted. Freihofer has not shown that it has extra carrying costs as it purportedly has no plans for selling or using the property. Furthermore, it brought the present delay upon itself by refusing to engage in the SE-QRA process.

. See for example Matter of Oates v Village of Watkins Glen (290 AD2d 758, 759 [2002]), cited by Matter of Save Our Main St. Bldgs, v Greene County Legislature (293 AD2d 907, 909 [2002]), which denies standing to all would-be litigants who are indirectly affected by changed “traffic patterns, noise levels, air quality and aesthetics throughout a wide area,” but overlooks that the Court of Appeals did not exclude all of those would-be litigants from the pool of potential litigants with standing.

. This argument was not properly raised as part of respondents’ motions to dismiss. It is in the nature of a summary judgment argument because it requires facts outside of the petition. As movants, the respondents bear the initial burden of establishing a prima facie showing of entitlement to judgment as a matter of law, tendering sufficient evidence to eliminate any material issues of fact from the case (Zuckerman v City of New York, 49 NY2d 557, 562 [1980]).